## DARLINGTON *v.* TURNER.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 196.    Argued March 6, 7, 1906.—Decided May 14, 1906.

Although the auditor and both courts below found that plaintiff in error's testator had been guilty of fraud and that his estate was liable, and under the general rule this court will not disregard a particular state of facts found by both courts below, still it can and will do so, when it is constrained to the conclusion that the premise upon which those courts acted is without any support in the evidence and rests upon a mere mistaken assumption; and so held in this case where the finding of fraud rested on the uncorroborated testimony of an interested witness who had been so discredited by uncontroverted evidence in regard to his own acts of omission and commission as to render it impossible to accept his testimony as establishing the alleged fraud of the deceased.

Where by the law of their domicil, as is the case in Louisiana, minors are represented by their father as administrator, with full power under that law to receipt for, and administer for their account, property bequeathed to them by a testator domiciled and dying in Virginia, a transfer of such property to the father as the administrator or representative of his minor children by a person having possession thereof in the District of Columbia, is valid and binding.

Under the circumstances of this case decedent's liability for an amount invested having been fixed with accuracy as to time and amount, and it

being impossible from the record to ascertain the ultimate fate of the investment, and whether it was so lost as to relieve decedent from responsibility, the court will hold the estate liable therefor with legal interest but subject to adjustment for admitted overpayments to one of the complainants.

In June, 1898, Philip A. Tracy died in the city of Washington, where he was domiciled. His will, executed in Washington on March 2, 1894, was duly probated in August, 1898. The will directed the executors to build a family monument, to cause to be inscribed thereon the names and the dates of the birth and death of the deceased, of his father and mother and of a brother and sister, in accordance with minute directions contained in a memorandum accompanying the will. A bequest of one thousand dollars was made to the Oak Hill Cemetery Company to perpetually care for the lot and the monument. In addition, after making several minor bequests, one of which was a gift of one hundred dollars to the Home for Incurables, two thousand dollars was given for a Sunday School building for the Trinity Episcopal Church in the city of Washington. The residue of the estate was bequeathed "to the trustees of the Epiphany Church Home in this city, to pay for the enlargement of the building now used as the home, or for the erection of another building for the same use and purpose." George W. Gray and J. J. Darlington, the executors named in the will, qualified.

Within one year, and before receiving notice of the claim which is the subject of this suit, the executors of Tracy had paid the debts, had discharged the minor legacies above referred to, and had in hand to be applied to the other provisions of the will forty-seven thousand dollars in money and securities and two unimproved lots in the city of Washington of small value. The further execution of the will was prevented by a demand to pay the claim which forms the basis of this suit, and upon refusal to do so on June 10, 1899, this bill in equity was filed to establish and enforce the claim. The complainants were Erle H. Turner and Wilmer Turner, and Ashby

and Lunette Turner; the last two, being minors, were represented by Wilmer Turner as their next friend.

It was in substance averred in the bill that Silas H. Turner, a paternal uncle of the complainants, died in Fauquier County, Virginia, on September 21, 1888, leaving a will by which he bequeathed equally to complainants, who were the children of Thomas M. Turner, all the property of which the testator died possessed, the will being as follows:

"WASHINGTON, D. C., April 30, 1888.

"I hereby give and bequeath to the four children of my brother Thomas M. Turner of Minden, Louisiana, all property real and personal, owned by me, or in which I have any interest at the time of my death, and appoint Philip A. Tracy to distribute the proceeds of the said property equally between them.

"S. H. TURNER.

"Witness: PHILIP A. TRACY.
          "GEORGE G. FENTON."

It was also alleged that this will was admitted to probate in Fauquier County, Virginia, on or about November 28, 1888. It was then alleged that Philip A. Tracy was the confidential agent and trustee of Turner, deceased, and in that capacity had in his possession money which, as agent and trustee, Tracy had invested for the benefit of said Turner. It was charged that shortly before the death of Turner, Tracy had given Turner a memorandum or list, entirely in the handwriting of Tracy, stating the dates and amounts of the promissory notes held by Tracy, belonging to said Turner, and the names of the makers thereof, and that the said notes aggregated $28,972.10. This memorandum or list, alleged to be wholly in the handwriting of Tracy, was copied in the bill, and it was averred that after the death of Turner, Tracy had admitted the accuracy of said list and his possession of the notes which it embraced. It was then averred that the land records of the District of Columbia

disclosed that all the notes mentioned in the alleged memorandum or list, and the accrued interest had been paid after the death of Silas H. Turner. It was averred that, with the exception of a sum of about fourteen hundred dollars, alleged to have been paid by Tracy to Erle H. Turner, no account had been rendered or distribution made by Tracy of the aforesaid property or of the proceeds thereof, and that, excluding the payment alleged to have been made, as above stated, to Erle H. Turner, "the entire trust fund, principal and interest and profits, had come into the possession of the defendants as executors of Tracy."

The paragraph of the bill immediately preceding the prayer was as follows:

"21. That the domicil and citizenship of the parents of complainants have always been since the birth of these complainants either in the State of Louisiana, which was their domicil, until about the — day of August, 1889, or in the State of Texas, which has been since and is now the domicil of said parents and of all complainants, except complainant Erle H. Turner, whose domicil is now Philadelphia, Pennsylvania. Complainants are informed and believe and therefore aver that by the laws of Louisiana and of Texas the parents of minor children are not of right guardians of the estate of such minors, and no person is authorized to receive or demand the estate of any minor domiciled in either of said States, except such persons as shall be duly appointed by a court of the States having competent jurisdiction; and that neither the father nor the mother of any of these complainants nor any other person has ever been appointed by any court guardian of either the person or estate of any one of these complainants, and no one of these complainants has now or has ever had a legal guardian of the person or estate, and at no time has there been any person in being competent in law to demand or receive, in their behalf, any estate for any of these complainants, until, by reason of reaching their majority, two of these complainants have become sui juris."

Discovery was prayed of a paper which had been written and left by Tracy, containing representations regarding the claim of complainants. In substance the prayer was for a discovery and account in the premises, and for a decree distributing among the complainants the sum which might be found due upon the account. There was also a prayer for general relief.

The answer of the executors of Tracy was in substance as follows: That Silas H. Turner and Tracy had business relations was admitted; but in the main all the material averments of the bill were alleged not to be within the knowledge of the executors, and proof of such averments was demanded. It was expressly averred, however, that Tracy, after the death of Silas H. Turner, had fully accounted for any property which he had in his possession, by a transfer and payment made to Thomas M. Turner, the father of the complainants, as their natural tutor and agent, they being then minors, as evidenced by a receipt signed by Thomas M. Turner, and dated November 30, 1888, which receipt was copied in the answer. Answering the paragraph of the bill calling for the discovery in respect to the paper left by Tracy regarding the claim of complainants, the defendants set forth that there came into their possession the following paper:

"WASHINGTON, D. C., —, 1898.
"To the executors of my last will and testament:

"Some time in 1871, Silas H. Turner of Virginia, whom I had known for a long time, of his own volition and without solicitation from me, came to the city and asked me to aid him in investing some twelve thousand dollars ($12,000) in real estate notes. I consented and in a few weeks the whole amount was invested, and he took the notes home with him. The interest was payable semi-annually, and, for a time, he sent me notes by mail about the time the interest was due so that it could be credited on the notes to satisfy the maker. This became irksome and, after a time, he brought me the notes, keeping a list of them, and asked me to keep them to

save him the trouble of sending them to me by mail whenever the interest was due. I kept the notes in an envelope with his name upon it, and about twice a year sent him a memorandum of interest paid, and when the amount reached several hundred dollars I would buy another note, and send him a memorandum of the same. Also when a note was matured and paid, I would buy another note, unless he needed the money, which he rarely did, and send him a memorandum of it. This condition continued until 1888, when he died in Virginia, leaving his entire estate to the three minor children of his brother then living in Louisiana. In his will he named me to settle up the estate and divide the money among the children; but, as the laws of Virginia require two witnesses to a will and says neither of them shall be an executor, I could not qualify, and, as the father, if appointed, could not have given the bond, I handed him the package of notes, advised him to deposit them in the Second National Bank of Washington, D. C., which he did, and agreed to look after them and have them all paid, he being out of the city. His other relations, a sister, some nephews and nieces were much displeased with the will, and threatened to attempt to have it set aside, but have not done so. The father, a good, honest man, took the money or most of it, went to Texas and bought a farm, and was doing well until the panic of 1893 came on. Since then they had a hard time, getting little or nothing for their farm products, and have written me some heartrending letters, wishing they had left the money here. The children are of age, but of course the father could not pay them their parts of the estate, and though not a word has been said about it, I thought perhaps after my death, if they hear of it in time, some of them might attempt to hold me responsible, and if they should make such an attempt I hereby authorize and direct my executors to employ the best counsel in the city to defend my estate in the District Courts and in the Supreme Court of the United States, if it be necessary to appeal the case to that court, and to pay all costs and lawyers' fees out of my estate.

I suppose some one would have to qualify as administrators under the will before any action could be taken. My turning the property over to the father helped to keep it in possession of those to whom it was left, and to discourage and shut out the dissatisfied relatives, for if any one had qualified the matter would have been open for a year, and they would undoubtedly have made an attempt to have the will set aside. This is a plain statement of the case, intended for the private ears of my executors."

Referring to the prayer for discovery in other respects, it was averred that the only papers concerning business dealings between Tracy and Silas H. Turner which had come into the possession of the executors were the receipt given by Thomas M. Turner, as already stated, the memorandum of Tracy addressed to his executors, and various letters and receipts signed by Erle H. Turner. The executors specially alleged that to their knowledge none of the proceeds of any of the notes referred to in the alleged memorandum or list averred in the complaint had ever come into the hands of the executors, and that they had no knowledge of any disposition made of any property belonging to Silas H. Turner which might have been in the hands of Tracy, except as shown by the receipt of November 30, 1888, signed by Thomas M. Turner as natural tutor and agent of his minor children. The laches of the complainants was expressly set up as depriving them of the right to any of the relief asked for. Denying knowledge of where Thomas M. Turner was domiciled at the time of the signing of the receipt, or the lawful powers of Turner as to signing the receipt, the court was asked to determine the rights of the executors in the premises.

After joinder of issue and the taking of general evidence the case was heard in the Supreme Court of the District.

In substance the court in its opinion declared that Tracy and Thomas M. Turner, the father of the complainants, had conspired to despoil them, they being then minors, of their rightful share of their uncle's estate; that the receipt given by

Turner to Tracy did not protect Tracy or his estate, because Turner had not qualified in accordance with the laws of Louisiana so as to entitle him to represent his minor children, but even if he had so qualified Tracy had no authority to pay from the fund in his hand except in the due course of administration. The court also observed that the words of the will appointing Tracy to distribute the proceeds of the property bequeathed equally between the four children of Thomas M. Turner imposed the duty upon Tracy of qualifying as executor, or, if he was unable or unwilling to do so, of applying to the court for the appointment of a suitable person. And the fraud and wrong of Tracy in turning over the property to the father was emphasized by the statement that Tracy wrote the will of the deceased and was then informed by the latter that his object was to prevent his estate from coming into the hands of the father of the children because of his spendthrift character. Although the court concluded that the estate of Tracy was liable, it did not fix the amount for which the estate was accountable, but referred the matter to an auditor to state an account and to take further evidence in respect to the expenditures properly chargeable against the share of each of the complainants upon the principles expressed in the opinion.

The auditor heard additional testimony bearing upon the expenditures made by Thomas M. Turner for the maintenance of his children out of the fund which he had received from Tracy. An account as of February 1, 1894, was stated to the court. On this account the receipt given by Thomas M. Turner was disregarded. The sum in the hands of Tracy and due to the estate of Silas H. Turner was fixed by the alleged list set out in the bill. The ground upon which this was done was thus stated by the auditor in his report:

"After the death of Silas Turner there was found among his papers an envelope or jacket indorsed 'Notes belonging to S. H. Turner 1888;' it contained a list, in the handwriting of Tracy, of the notes, giving the date, name of maker, and amount. The date of the last note on the list is given as

March 12, 1888. The aggregate principal of these notes is $28,972.10.

"Evidently all of these securities were in Tracy's possession as late as March 12, 1888.

\*    \*    \*    \*    \*    \*    \*    \*

"It being conclusively shown that within six months before Turner's death Tracy had nearly $29,000.00 principal of securities in his possession as agent or trustee of Turner, the inevitable presumption of law is that of continued possession and accountability."

Making certain deductions and additions, which it is unnecessary presently to refer to, the auditor found the amount due from Tracy's estate on February 1, 1904, principal and interest, to be $48,601.44, which was attributed in varying proportions to the complainants, depending upon the amount which the report found each one of them was bound to contribute for maintenance or sums received out of the fund. The report was excepted to, exceptions were overruled, and a decree was entered adjudging the sums found due to the complainants in accordance with the report, giving the right to collect the deficiency out of further assets if any were discovered. An appeal was prosecuted. The Court of Appeals affirmed the decree, 24 App. D. C. 573, with a slight modification, rendered necessary by the allowance of an increased charge against Erle H. Turner. The Court of Appeals, in its opinion, in effect expressed views similar to those which had been stated in the opinion of the court below and in the report of the auditor. The receipt of Thomas M. Turner was disregarded. Taking into consideration the testimony, the paper alleged in the bill as a list was treated as being all in the handwriting of Tracy and as being but a single document, and, therefore, as fixing the amount for which the estate of Tracy was accountable.

*Mr. Clarence R. Wilson* and *Mr. Nathaniel Wilson* for appellants:

The payment of November 30, 1888, by Tracy to Turner

was made at the request and by reason of the representations of Turner and was, on Tracy's part, made in good faith and not with the purpose of personal profit. Turner was clerk of a court in Louisiana and his statements were made with apparent authority. There were no debts of the estate and there was no occasion for administration.

According to the laws of Louisiana, Thomas M. Turner, as father of the complainants, had the right to the possession and enjoyment of the estates of his minor children during their minority. Revised Civil Code of Louisiana, 1870, in force in 1888; Book I, tit. 7, ch. 5, under the heading "*Paternal authority;* " §§ 221–224; Book II, tit. 3; §§ 533, 540, 560, 589.

These provisions of the Code are construed and explained in the following cases: *Cleveland* v. *Sprowl*, 12 Rob. 172; *Handy* v. *Parkinson*, 10 La. Ann. 92; *Greenwood* v. *City of New Orleans*, 12 La. Ann. 426; *Snow* v. *Copley*, 3 La. Ann. 610; *Renfroe* v. *Gates*, 7 La. Ann. 569; *Succession of Allan*, 48 La. Ann. 1240.

A voluntary payment by a person having in his hands funds belonging to persons living in a foreign jurisdiction is valid, if, according to the laws of that jurisdiction, the person to whom the payment was made had the right to receive the money; and a receipt given by such person is a valid discharge and acquittance to the person so paying the money.

The principle, that administration when had at all must be had within the jurisdiction in which a testator's will is filed, or within the jurisdiction in which his property was situated, has no application to the present case.

Courts look with favor upon the private settlement of estates, where there are no debts or where the claims of creditors are satisfied. *Akin* v. *Akin*, 78 Georgia, 24; *McCracken* v. *McCaslin*, 50 Mo. App. 85; *Roberts* v. *Messenger*, 134 Pa. St. 298; *Foote* v. *Foote*, 61 Michigan, 181; *Filbey* v. *Carrier*, 45 Wisconsin, 469; *Burton* v. *Brugier*, 30 La. Ann. 479.

A voluntary payment to a foreign executor is a good discharge to the person making the payment, even as against a

subsequent demand by an executor appointed by the court in the jurisdiction in which the property was situated. *Doolittle* v. *Lewis*, 7 Johns. Ch. 45; *Williams* v. *Storrs*, 6 Johns. Ch. 353; *Parsons* v. *Lyman*, 20 N. Y. 103; *Bank* v. *Sharp*, 53 Maryland, 521; *Wilkins* v. *Ellitt*, 9 Wall. 740; *Rand* v. *Hubbard*, 4 Met. 252; *Hutchins* v. *Bank*, 12 Met. 421; *Stevens* v. *Gaylord*, 11 Massachusetts, 256; *Trecothick* v. *Austin*, 4 Mason, 6, 33; *Mackey* v. *Coxe*, 18 How. 104.

*Mr. William G. Johnson* for appellees:

The payment by Tracy to Turner was not a discharge, because a payment to anyone other than the party entitled or to his agent is no payment in law. Agency can only arise by contract or operation of law. The appellees made no such contract and could make none, because they were all minors and he had never been appointed their guardian, and his only relation to them was the natural one of father. The fact that Thomas M. Turner was the father of the complainants is immaterial. Payment to him was no better than to a stranger. *Dagley* v. *Tolferry*, 1 P. Wms. 285; *Cooper* v. *Thornton*, 3 Brown's Ch. Cas. 96; *Miles* v. *Kaigler*, 10 Yerg. 10; *Perry* v. *Carmichael*, 95 Illinois, 519. See also *Tripp* v. *Gifford*, 155 Massachusetts, 111; *P. C. C. & St. L. Ry.* v. *Haley*, 170 Illinois, 610.

Thomas Turner had no power under Louisiana laws to receive payment.

He was not a "natural tutor," as he describes himself in signing the receipt. At that time his wife, the mother of the children, was living and the parents were not divorced. During the marriage there cannot be a "natural tutor." *State* v. *Parish Judge of Orleans*, 6 La. Rep. 363.

Turner never complied with requirements of Louisiana law made a condition precedent to the right of possession. It is not, therefore, in the character of "tutor" that he could acquire any rights to the estate of his minor children, but this right is claimed for him as "usufructuary." Arts. 223, 224,

540, 557–560, La. Code. See also art. 3350 added by the act of 1869; *Succession of Arland,* 42 La. Ann. 548.

Louisiana laws have no application to property without the State. If Louisiana's laws of permission can have greater force in this District than in Louisiana, then, indubitably, her laws of prohibition upon those attempting to exercise authorities under them must have at least an equal force here with that which they possess in Louisiana.

According to the decisions of the highest court of that State, construing its own statutes, Thomas Turner, had he complied with all the prerequisites of the laws of Louisiana, would have been without power, under its laws, to receive property situated out of the State. *Moise* v. *Life Association,* 45 La. Ann. 737.

The laws of Virginia, the domicil of the testator, control and exclude the laws of Louisiana. *Harrison* v. *Nixon,* 9 Pet. 483. The common law of England is in force in Virginia. Va. Code, 1887, § 2. See also *Cooper* v. *Thornton,* 3 Brown's Ch. Cas. 96.

The right of usufructuary claimed for Thomas Turner, under the laws of Louisiana, in this case, is not an official character in which he is representative of the Louisiana legatees and claims the legacy in their behalf, but is a beneficial interest in himself, in right of his parentage, a part of the Louisiana law of domestic relations, applying to persons and property within the State, and can clearly have no application to property never in the State. *Texas and Pacific Ry. Co.* v. *Humble,* 181 U. S. 57.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

As no reference was made to the subject in the opinions below and as we construe the argument at bar as not seriously pressing such question, we assume, for the purposes of the case, the right of the complainants to maintain under the averments of their bill a direct action or suit to recover the fund in con-

troversy. To come to the substantial merits we summarily dispose of certain preliminary contentions. First. We are of opinion that upon the pleadings and proof the Court of Appeals did not err in holding that such fiduciary relation existed between Silas H. Turner and Philip A. Tracy as made a court of equity the proper forum to seek relief. Second. We also think that under the circumstances of the case the contention that the bill should be dismissed because of the variance between the allegations and the proof is untenable.

In proper sequence the questions for decision are threefold: First. Was the transfer of the property of the estate of Silas H. Turner made as shown on the receipt given to Tracy by Thomas M. Turner as the representative of his minor children lawful and binding upon such minors? Second. If the payment referred to was binding did the receipt and the paper contemporaneously executed by Tracy, in connection with the proof, establish that he or his estate was liable for the value of the investment in real estate shown by the receipt and the paper in question to have been retained in the control of Tracy? Third. Did the receipt, if binding, and the paper in connection with it, embrace all the property held by Tracy as the trustee of Silas H. Turner, or, in other words, did Tracy at the time the receipt was given honestly account for the property in his hands, or did he fraudulently retain for his own benefit a large amount of property of the estate which should have been paid over and for which Tracy or his estate is therefor liable?

Whilst in logical order the questions for decision are as stated, we shall consider them inversely. In other words, we shall first dispose of the alleged fraudulent retention by Tracy of a large portion of the trust fund at the time he made the payment and transfer of property to Thomas M. Turner as the representative of his minor children. We do this because the charge of conspiracy and fraud as pressed, not only in the argument at bar, but in the opinions below, was treated as affecting the question of the binding nature of the transfer made by Tracy to Turner; and by first disposing of that branch of the case

we shall in a great measure disentangle the question of the binding efficacy of the transfer and payment to Thomas M. Turner from the alleged fraud.

It will be useful, before particularly considering the facts upon which the alleged fraud on the part of Tracy immediately depends, to state the antecedents of Tracy and of the two Turners, the dealings between them and the results which followed therefrom, so far as they are uncontroverted.

Philip A Tracy was born in Fauquier County, Virginia, in 1835. He was living in Washington soon after the close of the Civil War, was a bookkeeper in a mercantile house, and later became an employé of the Post Office Department, and so continued, if not to, at least up to a short time prior to, his death. He never married. As far as it may be inferred from the testimony in the record, taking no present concern of the charges of fraud made in the bill, the conviction is irresistibly conveyed to our minds that Tracy was a reasonably intelligent, moral, industrious and circumspect person, of a religious tendency of mind, careful in money matters, particular as to details and of a kindly, though somewhat eccentric, nature.

Silas H. Turner was also a native of Virginia, and whilst little is shown by the record of his antecedents and character, it is established that he was also a man of thrift and of some business capacity, having been at one time a railroad agent, a dealer in merchandise and cattle, a clerk and an accountant, accustomed to the settlement of estates. Between Tracy and Turner there existed an association and friendship, taking its origin, if not in a boyhood acquaintance, at least one that related back to many years before the death of Turner. As a result of this friendship Turner, trusting in the capacity and integrity of Tracy, began in 1871 to confide his savings to the latter for investment. Tracy, loaning money upon the security of real estate, was first in the habit, when a loan was made, of sending the notes of the borrowers to Turner, who, as the interest payments were about to fall due, would send the notes to Tracy to have payments of interest credited thereon. After

a time this practice of sending and returning the notes became irksome, and Turner sent the notes to Tracy, who thereafter kept them in his custody. As money came into the hands of Tracy, either from the payments of principal or of interest upon the notes, he reinvested the money in other notes, sending Turner a memorandum of the new investments as made. There is nothing produced either from the papers of Tracy or of Turner showing that formal accounts were ever exchanged between the parties. Certain it is, that on April 30, 1898, Turner was in Washington and in personal communication with Tracy. At the desk of Tracy in the Post Office Department, at the request of Turner, the will probated as mentioned in the statement of facts was written by Tracy for Turner, and by the latter executed. How long Turner remained in Washington at this time the record does not disclose, nor does it accurately show his movements or exhibit any letters passing between Tracy and Turner from the time of the making of the will up to the death of Turner.

Some time during the summer of 1888 Turner—an ill man, suffering with Bright's disease—went to the residence of Mrs. Rust, a niece, living in Fauquier County, Virginia, near Warrenton, where he remained until his death on September 21, 1888. At his death Turner left surviving him a maiden sister, who lived in Frederick, Maryland, Miss Henrietta Turner; a brother Thomas M. Turner, living in Minden, Louisiana, and various nephews and nieces, children of deceased brothers and sisters.

Between Thomas M. Turner, the brother living in Louisiana, and Silas H. Turner, it would seem, there had been little or no intercourse for more than thirty years, Thomas having left Virginia when quite a young man. Notified of the serious illness of his brother, Thomas M. Turner, about a month and a half before the death of Silas, came to the house of Mrs. Rust and there remained until the death. Thomas M. Turner had had at that time quite a varied experience of men and affairs. Leaving Virginia as a youth he went to Memphis, Tennessee,

for the purpose of establishing a school. Not succeeding there
he went to Missouri and became a bookkeeper for a commercial
firm. At the outbreak of the war he joined the Confederate
army. At its termination he established himself at Minden,
Louisiana, and began merchandising, and also operated a
steamboat landing. He married, bought a farm near the town
of Minden, where he lived, and was for a year bookkeeper for
a large business house; afterwards became a division super-
intendent of education; was subsequently a clerk of the state
District Court—a court of unlimited general jurisdiction; was
the parish treasurer and treasurer of the school board; for a
time served as a justice of the peace, worked for lawyers in
making up legal accounts, prepared the collectors' tax dupli-
cates, etc.; afterwards became deputy clerk, and held the
latter office at the time he was called to Virginia on account
of the illness of his brother. At the time he came to Virginia
he left at Minden his wife and five children, all minors and
the issue of the marriage, the youngest being an infant, who
lived but a comparatively short time. The names and dates of
birth of the other children were as follows: Erle H., born on
October 21, 1868; Wilmer, born on October 11, 1875; Ashby,
born on February 3, 1880, and Lunette, born on December 19,
1882.

Omitting reference to the controverted question as to what
passed between Silas and Thomas preceding the death of the
former, certain it is that after the death of Silas there was found
in a trunk belonging to him some few personal effects, the will
which was afterwards probated, and an envelope containing
papers—the so-called list set out in the bill and referred to in
the report of the auditor and in the opinion of the Court of
Appeals.

On September 28, 1888, Thomas M. Turner came to Wash-
ington, and in company with Eppa Hunton, Jr., Esq., a mem-
ber of the Virginia bar, had an interview with Tracy. What-
ever took place at this interview forms, we think, one of the
principal controversies of the case, and we shall have occasion

hereafter to fully advert to it. Certain it is upon that day Turner received from Tracy in cash a little over four hundred dollars, and Turner returned to Virginia. From that time (September 28, 1888) up to November 26, 1888, except a letter written by Tracy to Turner on October 10, 1888, there is nothing in the record showing any relations between Tracy and Turner concerning the property in the hands of Tracy. On the date last named (November 26, 1888) Mr. Hunton offered the will of Silas H. Turner for probate in the County Court of Fauquier County; a commission was issued to take the testimony of Tracy and the other attesting witness to the will, and the commission was executed on November 28, in the city of Washington, immediately taken to Warrenton, and on the same day the will was admitted to probate.

The next day, after the probate of the will, Turner appeared in Washington and called upon Tracy. Tracy handed to Turner a list of the notes, cash and other property in his possession, which he proposed to turn over as belonging to the estate of Silas H. Turner. Turner took the list and examined it overnight, returned the next morning, received the notes and the additional cash mentioned in the receipt, and as to a piece of real estate specified in the list received the following certificate from Tracy:

"I hereby certify that I have invested three thousand six hundred dollars ($3,600.00) in ground on Maryland avenue between 9th and 10th streets N. E., at thirty-five cents per square foot, and that Silas H. Turner is entitled to one-half of the proceeds derived from the sale of the same, after deducting the cost of grading, subdividing and examining titles, etc.

"PHILIP A. TRACY."

The entire question of fraud on the part of Tracy depends upon the statements of Turner as to what took place between himself and Tracy when he gave the foregoing receipt, and as to the conduct of the latter concerning the so-called list which

has been previously referred to. This we shall consider when
we come to the controverted questions.

At the suggestion of Tracy the notes covered by Turner's
full receipt were placed in a bank at Washington for collection,
Tracy introducing Turner to the bank and assisting him in
opening the account. Turner went to Virginia, with some of
the cash received paid the funeral expenses and the debts of
his brother, took his sister and a niece with him to Louisiana,
and from Louisiana he went to Texas with his family and also
with the sister and niece just referred to. In Texas, Turner
bought a lot in a town called Vernon, boarded his family until
he built and furnished a house, bought and partially paid for
a ranch consisting of six hundred and forty acres and equipped
it with stock and machinery. In the summer of 1890 he
brought this entire family to Virginia, leaving his son Erle H.,
who had then become of age, on the farm in Texas as manager.
He bought, in his own name, a house and lot in Front Royal,
Virginia, the possession of which he turned over to his niece,
Mrs. Rust, telling her that it was hers, and that it was done
in accordance with directions given before his death by his
brother Silas. Whilst in Virginia he visited Washington and
saw Tracy. In the fall of 1890 Turner went to Texas, leaving
his family in Virginia. He remained in Texas but a short time,
coming back to Virginia either in the late fall of 1890 or early
winter of 1891. In February, 1891, he drew on the proceeds
of the notes which had been deposited a check for the sum
of forty-eight hundred dollars and carried the money away
on his person, stating in his testimony that one reason why
he did so was that he did not want the heirs in Virginia to
know where the property was; that he was trying to keep
it concealed as much as he could; that he was managing his
own affairs and did not want anybody to know anything about
it, and that he was trying to get the money away from Wash-
ington entirely. In April, 1891, Erle H. Turner, the son, left
the farm in Texas and came to Virginia. He visited Wash-
ington with the father, who introduced him to Tracy. The

father paid the son out of the proceeds of the notes in bank twelve hundred dollars, and delivered to him two of the notes previously turned over by Tracy, which had not been collected, of the face value of $525. The father testified that this payment to the son was made on account of some small indebtedness which he owed the son for money received for safekeeping from him whilst a boy and in discharge of a debt which the father declared he owed the son for managing the farm, which it had been agreed was to be compensated for by a half interest in the proceeds of two crops. One of the crops had been harvested and the other was still on the land and ungathered when the settlement was made.

From the date of the delivery by Tracy to Turner of the notes to the time of the payment made to Erle H. Turner, as just stated, all the notes delivered by Tracy to Turner and deposited to the credit of the latter had been paid, principal and interest, except the two which were turned over to Erle H. Turner on the alleged settlement with the father. During this time the record shows letters written by Tracy to Turner of a friendly character, advising Turner concerning the progress of the collections, and suggesting business methods for overcoming difficulties which arose, without the slightest intimation in any of the letters that there was in Tracy's mind even an impression of a difference between himself and Turner, or that Tracy supposed that there was any claim against him resulting from the transfer which had been made to Turner on November 30, 1888, except as indicated on the receipt then signed by Turner and the accompanying certificate relative to the Maryland avenue lots.

As the consequence of the settlement made with Erle H. Turner, practically all that remained of the money coming from the proceeds of the notes delivered by Tracy to Turner had been checked out by Turner, and it is true to say that the record leaves no question that in effect substantially all the family living and traveling expenses, the disbursements for the residence lot in Texas, the cost of the erection and the

furnishing of the dwelling, the cost of the farm and of fencing, and for stock and machinery bought for use thereon, had been defrayed out of the fund transferred by Tracy, as also the cost of the Virginia residence bought for Mrs. Rust, and various gifts of money made by Turner to nieces and nephews.

Not only during the period whilst the notes were being collected by the bank for the account of Turner and he was drawing out the proceeds—indeed up to shortly before the bringing of this suit—Turner swore that he intentionally concealed from his wife and children, and from everybody concerned, the fact that his brother's will had been made in favor of the children, or that he had received under that will any property belonging to them. His testimony on this subject is so vital to the cause that we quote it.

On his direct examination he was interrogated and answered as follows:

"Q. You stated the other day that while you were East in the fall of 1888, at the time of your brother's death, you wrote home to your wife during that absence? A. Yes, sir.

"Q. I want to know whether or not you told your wife in any of your letters of the fact that your brother had left an estate? A. I think I did. I am not positive.

"Q. I want you to state whether or not you told her that he had by his will left the property to your children? A. I did not tell her that.

"Q. Was that omission intentional or accidental? A. It was intentional, sir.

"Q. After your return to Louisiana, after your brother's death, when did you and your family leave there? A. We left there in the summer of 1889.

"Q. Up to that time had you told anybody of the character and contents of your brother's will? A. No one, sir, except Mr. Hunton."

On cross-examination the witness testified as follows:

"Q. Did you within a few days after signing that write to your wife and tell her that your brother had left his property

to you? A. I don't think I did, sir. I can't say that I did. I have no memory of writing such a thing. I may have written to her that my brother had left property to us. I don't know what I wrote. It has been a long time, and I can't tell you.

"Q. Did you write to her in such a way as to conceal from her the truth, and intend to do so? A. I didn't intend that my children should know the property was left to them.

"Q. Why? A. Well, sir, it was my opinion that it would not be well for them to know it.

\*     \*     \*     \*     \*     \*     \*     \*

"Q. When did your wife first know the terms of the will of your brother? A. I don't know, sir.

"Q. When did you first communicate to her the fact that you had obtained the property or the estate of your brother? A. I never communicated it to her, sir.

"Q. And she never knew it? A. I don't know whether she knew it or not, but I never told her.

"Q. Do you know that she did know at any time? A. I can't tell you, sir. I don't know that she did.

"Q. Did you intentionally conceal the fact from your wife that you had received the estate of your brother? A. I guess I did, sir, intentionally.

"Q. And never up to the present time have you ever told her that you did receive your brother's estate? A. Oh, I don't remember whether I had or not. I couldn't say positively, sir.

"Q. Have you any knowledge yourself as to the time, or any time before the bringing of this suit, when she knew that you had and had received your brother's estate? A. No, sir.

"Q. You cannot say? A. I can't say."

Erle H. Turner, the son, after his introduction to Tracy, evidently inquired from Tracy concerning the estate of Silas Turner, and he expressly declares that Tracy then informed him that the property had been left to the children, and also told him of the investment in his hands arising from the Maryland avenue lots. It is plainly to be inferred that Erle

Turner communicated this fact to his mother, and, whilst there is no direct proof as to her consequent interference, it is inferable that both the mother and the son questioned the right of Tracy to make further payments to Thomas M. Turner. Undoubtedly, shortly thereafter, Thomas M. Turner called upon Tracy to pay over the proceeds arising from the Maryland avenue lots investment, which Tracy refused to do because of legal advice which he had received, unless Turner would qualify as an administrator, which he declined to do. It is also inferable that Erle H. Turner at that time made some demand upon the father concerning the estate, since the latter gave to him an order on Tracy for about twenty-five hundred dollars, delivering to the son the certificate as to the investment in real estate, which had been made by Tracy and given to Turner at the time of the transfer on November 30, 1888. Erle H. Turner did not return to Texas, but remained East, occasionally visiting Washington and calling upon Tracy, receiving money from him and corresponding with him from time to time in the most friendly way.

Thomas M. Turner having exhausted the proceeds of the notes which he had received from Tracy, never again came in personal contact with the latter. He went to Texas, leaving his family in Virginia. In January, 1893, under a power of attorney, he sold the farm near Minden, which he had transferred in 1870 to his wife. The expressed consideration for the sale on behalf of the wife was one thousand dollars. In January, 1894, Turner went to Virginia and took his family back to Texas. In September, 1894, Turner and his wife executed and put of record a deed conveying to Wilmer, Ashby and Lunette Turner the Texas farm, and reciting as the consideration thereof "the sum of $6,400 to me in hand paid by Philip A. Tracy, executor of the last will and testament of my deceased brother, Silas H. Turner, in trust for the use and benefit of my children, viz., Wilmer Turner, Ashby Turner and Lunette Turner, minors, which said trust fund together with other similar trust funds was turned over to me without bonds and

have been used by me for my own use and benefit, said consideration being in payment of so much of said trust fund."

It appears that the land embraced in the farm had originally been acquired by the grantor of Thomas M. Turner as school land from the State of Texas. Turner failing to pay the sixty dollars interest due on deferred payments, the land became forfeited to the State. Subsequently Turner repurchased it from the State at a reduced value, viz., one dollar per acre. In August, 1895, having previously mortgaged the dwelling house property in Vernon, Turner and his wife conveyed said property to the mortgage creditor in cancellation of the then existing indebtedness. At about this time Mrs. Turner wrote Tracy, asking for money. Her letter is not in the record, but the reply of Tracy (copied in the margin [1]) clearly shows that the letter was a request from Mrs. Turner to him to pay the proceeds of the Maryland avenue lots referred to in the receipt and embraced by the certificate already referred to. A

---

[1] Washington, D. C., Aug. 21, 1894.

Dear Mrs. Turner: I was out of the city and, therefore, did not get your letter until yesterday. I could not comply with your request. There is no money in my hands belonging to the estate of S. H. Turner.

After you and Erle raised a fuss because he had not gotten his share, I became alarmed and consulted a lawyer, and he advised me not to turn over another dollar of the estate money until Mr. Turner qualified for the full amount of the estate. I informed your husband of the fact, and he declined to qualify (the bond would be over $50,000) and he and Erle agreed that I should invest the money so that it might be earning something while in my hands.

I then invested the money in what was then good real estate paper, but the panic came on last year, the endorser of the notes failed in business, and the land has depreciated in value, so that if it were sold now I do not think it would bring half the amount of the notes. I have over $1,400 of my money in the same land. If times should ever get good again (which I doubt) the land would be ample security for the notes. I have let Erle have some $600 of my funds since I invested the estate money, but I cannot see my way clear to increase the amount in such times as these. I was surprised at his coming North, without money, in such times as these. He and his father knew the condition of the estate money, and I had twice advised him not to come until times got better. He told me he had over $2,000 loaned out in Vernon, and that after July he would have money.

Yours truly, etc., PHILIP A. TRACY.

letter written by Tracy to Mrs. Turner five months afterwards manifests his kindly interest in the welfare of the family and renders greater the certitude that no thought was in Tracy's mind that the parties deemed that he had perpetrated a fraud upon them or that they had any claim upon him otherwise than in respect of the Maryland avenue lots investment. And this is entirely corroborated by the intimate and friendly letters written by Erle Turner to Tracy up to a short period before his death, which shows clearly that Erle Turner considered that Tracy was accountable only for the lots referred to, and that he, Erle Turner, had received more than his share of the same. One of such letters—omitting purely irrelevant matter —is copied in the margin.[1]

Evidently, in consequence of the legal advice given him at the time objection was made by Erle Turner and his mother to the payment of the proceeds of the Maryland avenue lots to the husband and father, Tracy, as his health became impaired, grew to have an anxiety concerning the technical legality of the transfer of property which he had made to Thomas M. Turner, as shown by the receipt of November 30, 1888; and as a consequence he had prepared the statement on that subject produced by his executors. From 1895 until the death of Tracy in June, 1898, the record does not contain even the slightest proof tending to show any demand made upon Tracy or a suggestion of liability concerning the fraud and wrong charged in the bill in this case. That bill, as we have seen, was only filed in 1899, after the death of Tracy.

In March, 1901, Thomas M. Turner, as shown by his testi-

---

[1] Phila., April 4th.

Dear Mr. Tracy: Yours rec'd. I wrote you a hurried note to tell you that I w'd send the receipt 7 A. M. to-morrow per instructions. I have not been well. . . . A friend of mine told me that as you had paid me more than ¼ of the balance left in your hands this should clear you, as the balance would go to the other children, so I just made the suggestion. . . .

Yours, & etc.,          E. H. Turner.

P. S.—If you write or wire me hurriedly address for 2 weeks 1820 Susquehanna Ave. I am going to change my room soon but will let you know.

E. H. T.

mony, sold the Texas farm.   The following is a statement made by Turner of the amount claimed to have been realized and the disposition made by him of such proceeds:

"I sold the place, and the consideration was $5,000.   There was a deed of trust for $400 on the property, which the purchaser assumed.   I owed the purchaser $205.   That from the $5,000 left $4,395.   I paid $200 in debts from that, which left $4,195.   I owed my wife her home in Louisiana that I sold in 1893, I believe $1,000, and eight years' interest at 10 per cent, which is the legal rate in Texas.   That made $1,800.   I used of my wife's individual money, about the year 1870, $200. Interest on that to the present time would make altogether $680.   That would be $2,480 that I paid my wife, that was due her.   That left $1,715.   I owe about $100 in small debts there that I will have to pay out of that, which would leave $1,615 now that is community property between myself and my wife.   According to the laws of Texas she would be entitled to half of it and I half.   I have that much in money."

Explaining why he appropriated for his own and his wife's benefit the proceeds of the sale, to pay his alleged debt, despite the conveyance of the farm previously made by himself and wife to the minor children, Turner declared that while it was the same farm yet that it had become forfeited to the State and he had reacquired it and regarded it as community property belonging to himself and his wife, although the money which had been originally used in buying and improving the farm had come from the proceeds of the estate of his brother and belonged to the children.

With these facts in mind we come more directly to consider the fraud alleged to have been committed by Tracy at the time he made the transfer of property and took the receipt of Thomas M. Turner.   The principal ground upon which the auditor and both courts below rested their conclusion that Tracy had been guilty of such fraud was a discrepancy which it was assumed existed between a so-called list in Tracy's handwriting of notes in his hands, which list had been found

among the effects of Silas H. Turner at his death, and the correctness of which it was concluded was acknowledged by Tracy to Thomas M. Turner after the death of Silas H. Turner. In approaching the question of fraud we bear in mind the rule that where both courts below have found a particular state of facts, we do not disregard them except upon the conviction that the lower courts clearly erred in their conception of the weight of the evidence. Now, coming to consider the evidence in the light of this rule, we are constrained to the conclusion that the premise upon which the courts below acted, that is, the existence of a list of notes left by Tracy, is without any support in the evidence, and, indeed, rests but upon a mere mistaken assumption.

True it is that an envelope was found among the papers of Silas H. Turner with an indorsement upon it in the handwriting of Tracy, reading as follows: "Notes belonging to S. H. Turner, 1888." True also is it that two sheets of paper were produced with memoranda of notes upon each in the handwriting of Tracy. But to assume that these two sheets were one list made by Tracy and possessed as one list by Turner at the time of his death is to disregard the uncontroverted fact that the two separate sheets did not in and of themselves, as they existed at the death of Silas H. Turner, necessarily import that they constituted a single document. To treat them as such a document would oblige us to disregard the uncontradicted testimony of Thomas M. Turner that he brought the two papers together so as to cause them to appear to be one after the death of Tracy, that he placed on the first sheet the pencil footing and the line above the same and on the second the carrying forward of the same footing as also the new footing and the line above the same, by which alone on the face of the sheets apparent unity was produced between them. We copy in the margin [1] the two sheets, with the

---

[1] S. H. Turner.

| Nov. | 18, '82. | (W. Z. Partello) paid | $0,000 00 |
| Nov. | 1, '79. | Susan W. McNamee | 1,700 00 |

additions which, as above stated, were made after the death of Silas H. Turner.

So far as the face of these separate sheets as they stood at the death of Silas H. Turner indicate, they do not at all exclude the implication that the items on the second sheet were but the statement of reinvestments made by Tracy of money coming into his hands as the result of the payment to him of notes which were enumerated on the first sheet. Nor on the face of the papers does the fact that an envelope was produced with the words in the handwriting of Tracy written thereon "Notes belonging to S. H. Turner, 1888," necessarily give rise to a contrary deduction. For, *non constat* but that this envelope was marked by Tracy on delivering to Silas H. Turner the second sheet, or, that when it was marked, it contained

| | | |
|---|---|---|
| Jan. 19, '81. | Edwin F. Jones | 1,000 00 |
| April 7, '75. | J. H. Hollidge | 800 00 |
| March 22, '84. | John B. Taylor | 1,000 00 |
| March 22, '84. | John B. Taylor | 1,000 00 |
| July 12, '81. | Flora V. Andrews (2) | 1,000 00 |
| June 6, '85. | Jennie J. West | 3,400 00 |
| April 3, '85. | Caroline Isdell (2) | 1,335 20 |
| Dec. 15, '85. | Eliz. V. Lee | 600 00 |
| Dec. 15, '85. | Eliz. V Lee | 600 00 |
| Jan. 8, '86. | Mary J. Lewis (3) | 1,200 00 |
| Dec. 30, '85. | John L. Carusi | 1,350 00 |
| May 19, '86. | Julius Rehwold (4) | 2,200 00 |
| Dec. 24, '85. | Rufus A. Morrison | 1,500 00 |
| Oct. 30, '86. | John B. Avery (4) | 800 00 |
| Oct. 2, '86. | Thomas R. Benton (15) | 1,800 00 |
| June 1, '86. | G. H. La Fetra | 1,036 90 |
| April 18, 87. | L. A. Grant | 300 00 |
| Aug. 20, '85. | D. B. Groff | 1,500 00 |
| | (Footing in lead pencil) | 24,122 10 |

*Second sheet.*

| | | |
|---|---|---|
| 1888. | Am't for'd (in lead pencil) | 24,122 10 |
| Feb. 18. | C. W. Baldwin | 2,500 00 |
| Jan. 27. | A. H. Nixon (3) | 1,350 00 |
| Mar. 12. | D. B. Groff | 1,000 00 |
| | | 28,972 10 |

the first sheet exhibiting the property in the hands of Tracy at the beginning of the year 1888. When the course of business between the parties as stated by Tracy in the memorandum addressed to his executors is recalled, the greater probability is not only that the two sheets were not received by Silas H. Turner at one time, but that the second sheet was a mere memorandum of investments of items stated on the first sheet. The mode of dealing as stated by Tracy was this: He kept the notes belonging to Turner in an envelope. Periodically he would send a general statement to Turner, and when sufficient money was in his (Tracy's) hands arising from accumulations of interest or payment of a note, he would reinvest and send or give Turner a memorandum of the new investment. Now the condition of the first sheet justifies the presumption that it related to a general statement of the investments in the hands of Tracy at the end of the year 1887. The notes on this sheet, although grouped in disregard of chronological order, include notes dated from 1875 to and including 1887. On the other hand, the second sheet is but an enumeration of three notes executed in 1888, the last dated on March 12. This second sheet in no way corresponded, therefore, to a general statement between the parties, but is exactly responsive to the conception of a memorandum of reinvestments made in accordance with the custom described by Tracy. And by comparison of some of the items on the separate sheets cogency is added to the reasonable presumption that the second and separate sheet was but a statement of reinvestments made after January 1, 1888. Thus, on the first sheet is the following item: "Dec. 30, '85. John L. Carusi, 1350." Now if this note matured on December 30, 1887, and was paid shortly after its maturity, Tracy early in January, 1888, would have had that amount for reinvestment. Looking at the second sheet we find upon it an item showing an investment of precisely the amount of the principal of the Carusi note, as follows: "Jan. 27, 1888. A. H. Nixon (3) 1350.00."

As Turner and Tracy met in Washington on April 30, 1888, and in view of the reasonable probability that Turner must have been in possession of prior general statements of .the investments made by Tracy, the inference is persuasive that the memoranda embraced on the second sheet may have been delivered by Tracy to Turner at that time.

It is insisted that as Thomas M. Turner testified that he exhibited the two sheets as one paper to Tracy, and that Tracy told him that he had all of the notes described on both of the sheets in his possession and that they were "as good as gold," therefore the sheets were proven to be one and the liability of the estate of Tracy to account on that hypothesis was established. But in view of the state of the uncontroverted proof which we have previously noticed concerning Turner and his acts of omission and commission, we are constrained to the conclusion that he has so discredited himself as to make it impossible for us to accept his uncorroborated statements as establishing the alleged fraud and dishonesty of Tracy; although in reaching this conclusion we do not exclude the possibility that Turner may have harbored a suspicion that Tracy had not fully accounted, and communicated his suspicions to others. And even putting out of view the acts of commission and omission of Turner and the consequent inability to rely upon his testimony as to the commission by Tracy of the alleged fraud, the unexplained failure of the complainants to make certain proof, and the proof as made, clearly demonstrate that Tracy could not have been guilty of the fraud charged against him, and we under separate headings state our reasons for this conclusion.

1. The interview between Tracy and Turner, at which the alleged admission by Tracy was made concerning the list and his possession of all the notes shown on the two sheets, was the one had a week after the death of Silas H. Turner, at which Thomas M. Turner testifies that Mr. Hunton, his counsel, was present and heard the alleged statement made by Tracy. Yet

the testimony of Mr. Hunton was not taken. Besides, the bill contained an express averment that the land records of the District of Columbia established that the notes embraced on the first sheet which were omitted from the receipt signed by Turner had been paid after the death of Silas H. Turner, but no proof on that subject was offered. On the contrary, it was stipulated on the taking of evidence that five of the notes which were on the first sheet had been paid and the releases of trust executed after March 12, 1888, the date of the oldest executed note shown on the second sheet of the list, and before the death of Silas H. Turner, a fact which clearly rebuts the presumption that Tracy could have admitted to Turner on September 28, 1888, that he possessed notes which were good as gold, although they were not then in existence.

2. The face of the receipt itself (which is copied in the margin),[1] considered in the light of the uncontroverted facts

---

[1] Full List of Notes and Cash in the Hands of Philip A. Tracy, Belonging to S. H. Turner, Deceased, Nov. 30, '88.

Date of Notes.

| | | | | | | |
|---|---|---|---|---|---|---|
| Mar. 22, '84. | Two | notes of | John B. Taylor for $1,000 each | 2,000 |
| May 19, '86. | Two | " " | Julius Rehwold, $300 each.. | 600 |
| " " " | Two | " " | " " $800....... | 1,600 |
| April 18, '87. | One | " " | Louisa A. Grant........... | 300 |
| Mar. 12, '86. | One | " " | Diller B. Groff............ | 1,500 |
| " " " | One | " " | " " .............. | 1,000 |
| Dec. 15, '85. | Two | " " | Eliza U. Lee, $600 each..... | 1,200 |
| June 13, '88. | One | " " | Roth & Moore............ | 325 |
| Jan'y. 19, '81. | ." | " " | Edwin F. Jones........... | 1,000 |
| Feb. 18, '88. | " | " " | Charles W. Baldwin........ | 2,500 |
| Jan'y. 27, " | Three | " " | Alban H. Nixon, $450 each.. | 1,350 |
| July 12, '81. | Two | " " | Flora V. Andrews, $500 each. | 1,000 |
| Oct. 30, '86. | Three | " " | John B. Avey, $200 each.... | 600 |
| " 22, " | Seventeen | " " | Thos. H. Benton, $120 each.. | 2,040 |
| Aug. 25, '88. | One | " " | Frank W. Paige............ | 3,000 |
| Oct. 17, " | Three | " " | J. L. Burns, $462.50 each.... | 1,387.50 |
| Nov. 6, " | One | " " | E. V. Jarvis.............. | 200 |
| Nov. 19, " | Two | " " | C. S. McEwen (600 each).... | 1,200 |
| | " | lots on Md. Ave. N. E................... | 1,800 |

which we have stated, and other circumstances to which we shall advert, we think equally rebut the statements of Turner as to the alleged admissions of Tracy. It will be observed that the aggregate of both sheets of the so-called list was $28,972.10. The notes embraced upon the receipt given by Turner aggregated $22,802.50, a difference between the two footings of $6,169.60. Now, admitting that the two items of cash payments figuring in the receipt, amounting to $776.89, may be treated as interest, besides the notes, the receipt of Turner specified an investment of eighteen hundred dollars in the Maryland avenue lots, for which at the time Tracy delivered to Turner the certificate to which we have referred in stating the uncontroverted facts, and which Turner turned over to his son Erle. Deducting this eighteen hundred dollars, which Tracy admitted he owed, left only a difference of $4,369.60. How, under this condition of things, it could be found that Tracy admitted he was appropriating for his own benefit more than six thousand dollars we cannot conceive, since on the face of the transaction, under the most favorable view of the testimony for the complainants, Tracy was paying over or acknowledging his liability for everything but about four thousand dollars of notes. And yet more incredible does the theory of a fraudulent retention of over six thousand dollars by Tracy become when it is considered that Tracy permitted Turner to retain what would have been conclusive evidence of his fraud if the theory of the previous admissions of Tracy as to one list and its correctness, propounded by the complainants and found by the courts below, were true. If Tracy was infamous

| Sept. 28, | Cash, T. M. T. | 439.25 |
| Nov. 30, | "      "    in full | 337.64 |
| | (In'st now due) | 600 |

| | | $25,379.39 |

Nov. 30, '88.—Received the above-described notes and cash in full under the will of S. H. Turner, deceased.

T. M. TURNER.

*Natural Tutor and Agent for My Minor Children.*

enough to conceive the spoliation which is charged to have been committed by him, it would be certainly fair enough to presume that he would have exercised reasonable precautions to destroy the evidence of his wrongdoing.

Moreover, a comparison of the receipt with the two sheets supports the conviction that the second sheet was but a statement of reinvestments, and therefore that it was impossible that Tracy should have admitted that he was in fact stealing from or denying his liability to the estate of his dead friend in respect to the sum which he was either actually paying over or admitting his responsibility for. Now, the receipt embraced all of the notes mentioned on the second sheet, aggregating $4,850. It embraced certain notes found on the first sheet, aggregating $11,600. The receipt also embraced notes not appearing on the first sheet—in other words, replacing those omitted (and included the Maryland avenue lots)— indicating by their dates that they were acquired after the date of the last investment appearing on the second sheet of the list, viz., March 12, 1888, and after April 30, 1888, when Silas Turner was in the office of Tracy and made his will. These last items aggregated $8,152.50. The total of the various items footed up $24,602.50. Now, this sum was slightly in excess of the notes shown on the first of the two sheets of the so-called list, going to demonstrate that the settlement between the parties was based, not upon any deduction of an impossible sum of six thousand dollars, but upon the fact that the second sheet represented reinvestments of items appearing on the first sheet. And the cogency of this conclusion becomes manifest when it is considered that there is not an iota of evidence tending to show where Tracy could have gotten the money to invest in the notes which he turned over, acquired after March 12, 1888, unless it was from collections of the notes appearing on the first sheet of the so-called list, which, in consequence of their payment, were represented in the receipt by the new investments.

3. That at the time the receipt was given there was some

conversation on the subject of a probable charge by Tracy for his services rendered to Silas H. Turner, we think persuasively appears. In May, 1892, after the refusal of Turner to qualify as administrator of the estate and the refusal of Tracy to turn over the proceeds of the Maryland avenue lots to Turner unless he did qualify, Tracy wrote Turner a letter which is copied in the margin.[1]

It is true that Turner, in producing the letter, whilst acknowledging its receipt, declared that it was the first he had ever heard of any such charge or intention to charge; but Turner in no way intimates that he took issue with Tracy, by letter or otherwise, concerning the right of Tracy to make the charge, a line of conduct wholly inexplicable if the theory of a fraudulent retention by Tracy of six thousand dollars had foundation in fact. Having regard to the context of Tracy's letter we consider it as implying an intention to deduct for the benefit of the sister of Silas H. Turner the sum of the charge which Tracy had made or then proposed to make from the proceeds of the investment remaining in his hands. And we

---

[1] Post Office Department, Office of the First Assistant Postmaster General.
                                                              Washington, May 7, '92.

Dear Turner: I wrote you some time ago, but have not received any reply to my letter. I was in Phila, a short time ago, and called to see Erle, but was told he had left there, and gone to Balto. The interest on the $2,600, in my hands has not yet been paid through I expect it soon. It is invested in good paper and is drawing 8% *per cent* though after the present notes are paid I do not think I can get over 6% for it.

As I am now all alone in the world and have not much use for much money I have thought something of transferring to Miss Henrietta a part or perhaps all of the commission I charged on your brother's estate (5%) as she was left out of the will, and is poor as I understand it, and getting along in years.

If you will confer with her upon the subject, and ask her to write to me, I think the arrangement can be arranged.

This amount of my charge for attending to the business for 16 years ($120 a year) will stand.

I would like to hear how your wheat turned out? How much did you make and how much did you get for it.

        Yours, truly, &c.,                          Philip A. Tracy,

P. S.—I have not been well since the death of my sister.—T,

may remark in passing that there is proof tending to show that Tracy subsequently made remittances to the sister in question.

4. As we have said in stating the uncontroverted facts, Turner came from Louisiana to the house of Mrs. Rust, where his brother Silas was lying dangerously ill, about a month and a half before the death of Silas. The proof leaves no doubt that whilst there he frequently met his niece, Mrs. Rust, and other Virginia relatives, and had ample occasion to be aware of their frame of mind. There is no proof whatever showing that Tracy, whose home was in Washington, had any connection whatever with the Virginia relatives of Silas Turner, or was in a position to form an opinion concerning the probable conduct of those relatives as to a contest of the will of Silas Turner. And yet Turner swears that one of the principal causes of his yielding to the fraud of Tracy was the danger which Tracy persuaded Turner would arise in consequence of the purpose of the Virginia relatives to contest the will. Further, although the first interview between Tracy and Turner after the death of Silas was on September 28, 1888, the settlement between Turner and Tracy was not had until more than two months thereafter, viz., November 30, 1888. Now the only explanation Turner gives for this delay is that Tracy told him at the interview on September 28, 1888, that he was about to absent himself on a two weeks' leave and upon his return would inform Turner and they would have a settlement, a reason wholly inadequate to explain the long delay between that and the next meeting. That Tracy expected to. make a settlement and desired to keep in touch with Turner is shown by a letter written to Turner on October 10, 1888, from Old Point Comfort, advising Turner of his (Tracy's) whereabouts. Several of the Virginia relatives who were in contact with Turner during the considerable interval which elapsed between the first visit of Turner to Tracy and the final settlement testified to statements made in their presence by Turner, that he was awaiting the necessary papers from Louisiana showing his authority to represent his children, and that just before Turner

went to Washington to make the settlement with Tracy, Turner stated to them that he had the required authority. This shows that the matter of Turner's right to represent his children was, in all probability, the cause of the long delay in making the settlement, and is corroborated by a passage contained in a letter written by Turner to his daughter Wilmer in 1899, in which communication, referring to the occurrences at the final settlement with Tracy, Turner said:

"Tracy then informed me that as my brother owed no debts there was no use to have an administration; that he would not qualify as executor of the will, and that I need not delay to be appointed guardian for my children; that he would turn the notes over to me and I could place them in bank to be collected as they matured."

True it is that Turner testified that the words which he affixed to his name in signing the receipt describing his representative capacity, viz., "Natural tutor and agent for my minor children," were dictated by Tracy, but in view of the probable ignorance of Tracy of the Louisiana law and the experience and familiarity which Turner possessed on that subject, the statement cannot be accepted as true.

Considering all the evidence, our conclusion is that the proof not only completely fails to establish the commission of fraud or wrong by Tracy, but that on the contrary it clearly shows honesty and fair dealing on his part. Indeed, so far as concerns the transfer of property made to Thomas M. Turner without provoking an administration either in Virginia or in the District of Columbia, whatever may be its legal consequence, which we shall hereafter consider, we think the clear preponderance of the proof gives rise to the inference that that payment was made without administration because of Tracy's knowledge that there were no debts and because of the representations made by Turner that he was entitled under the law of Louisiana to receive the transfer on behalf of his minor children, and that if it were not made to him without legal proceedings there would be much unnecessary expense resulting

from a contest, and thus the purpose of the testator towards the beneficiaries of his will would be in part frustrated.

This brings us to consider the proposition of law whether the payment by Tracy to Thomas M. Turner, as the representative of his children, was adequate to prevent the estate of Tracy from being compelled to pay a second time.

It is undoubted that at the time of Silas H. Turner's death the children who were the beneficiaries under his will were minors and were domiciled with their father and mother, who were both alive and residing in the State of Louisiana. It is at once conceded that under the law of Louisiana a father or mother entitled to qualify as natural tutor (guardian) must be recognized by a court, and as a condition precedent to such recognition must have complied with the requirements of the law. Under the law of Louisiana such precedent requirements are the taking of the inventory, the recording of an abstract thereof and an oath of office. As it is established that Thomas M. Turner performed none of these requirements and was never recognized by a court as the natural tutor of his children, it is insisted that he was wholly without power to represent them or to receive the bequests made to them by the will of Silas H. Turner. But the proposition is inapposite and is based upon a misconception of the law of Louisiana resulting from the assumption that under that law the rules governing the qualification and appointment of natural tutors after the death of one of the spouses applies to the case of a father during marriage representing and acting for and on behalf of his minor children.

In the Civil Code of Louisiana of 1870, title 7, chapter 5, treating of father and child, it is provided as follows:

"ART. 221. The father is, during the marriage, administrator of the estate of his minor children.

"He is accountable both for the property and revenues of the estates, the use of which he is not entitled to by law, and for the property only of the estates, the usufruct of which the law gives him.

"This administration ceases at the time of the majority or emancipation of the children."

And in the same title and chapter it is further provided:

"ART. 223. Fathers and mothers shall have, during marriage, the enjoyment of the estate of their children until their majority or emancipation."

Moreover, in the same chapter, it is also provided:

"ART. 226. This usufruct shall not extend to any estate, which the children may acquire by their own labor and industry, nor to such estate as is given or left them under the. express condition that the father and mother shall not enjoy such usufruct."

These provisions of the Code of 1870 have obtained in that State from an early date. The first of them was in the Code of 1825 as article 267, under the title treating of minors and their tutorship, and under the same title the provision was contained in the Code of 1808 in section 2 of Title 8, article 5. And as the inevitable result of these provisions of the code it has long been settled in Louisiana that the plenary power of the father as administrator, during marriage, of the estate of his minor children, born of the marriage, was wholly distinct from tutorship, did not depend upon previous judicial recognition, and was not subjected to the precedent requirements essential to give rise to tutorship. In *Cleveland, Tutrix,* v. *Sprowl, Administrator* (1845), 12 Rob. 172, the court said (p. 173):

"Now, it is well known, that no tutorship exists, during the marriage, over the children issued from it, but that a child remains under the authority of his father and mother until his majority or emancipation. Civ. Code, Art. 234. The father is, during the marriage, administrator of the estate of his minor children; he is accountable both for the property and revenues of the estates, the use of which he is not entitled to by law, and for the property only of the estates, the usufruct of which the law gives him; and such administration ceases at the time of the majority or emancipation of the

children. Art. 267. The natural tutorship only takes place after the dissolution of the marriage, by the death of either of the spouses, and belongs of right to the surviving one. Art. 268. Thus it is clear, that the legal mortgage resulting from the tutorship, is not applicable to the administration of the minor's property, given by law to the father, during the marriage. He is not a tutor; his duties and responsibilities are very different; and the law does not appear to have intended, that while the minor's estate remains under his father's administration during the marriage, his child should have a legal mortgage upon his father's property, as a security for the said administration."

As a result, it was expressly decided that neither the legal mortgage resulting from tutorship nor the security generally required by law from usufructuaries were applicable to a father as administrator of the estates of his minor children during the marriage. Our attention has not been called to nor have we been able to find any decision of the Supreme Court of Louisiana modifying in the slightest degree the principles thus announced. On the contrary, in *Gates* v. *Renfroe* (1852), 7 La. Ann. 569, whilst the subject was not directly at issue, the court in its opinion assumed the law of Louisiana concerning the power of the father in administering the estates of his minor children, as previously stated, to be elementary.

It is certain that the article relating to the power of the father to administer during marriage, which was originally enacted in the Code of 1808, was drawn from the Code Napoleon. We say this is certain, because not only did the article as enacted in the Codes of 1808 and 1825 exist in the Code Napoleon in absolutely identical words, but it was also in that code placed, as it was in the two earlier Louisiana codes, under the heading of minors and their tutorship. Code Napoleon, Art. 389.

The fact that the provision should more properly have been classed under the chapter of the code treating of paternal

authority has been recognized in France. In commenting upon this subject Demolombe says (vol. 6, No. 409):

"It is evident that this article appropriately belongs to the title treating of paternal power, because during the marriage tutorship does not exist. It is alone in virtue of the paternal power that the father (or the mother in the case of the father's incapacity) is charged with the administration of the goods belonging to his minor children."

The same commentator thus expounds the spirit of the article (Ib. No. 415):

"During the marriage the father and the mother are present and coöperating with each other, consulting with each other, supervising as it were each other with that instinctive tenderness which is the result of their relation to their offspring. This the law assumes to be an assured and certain security for the children founded at the same time upon both paternal and conjugal affection, of which the children are the pledge, and of which they are the most potent links for the perpetuation of the union. . . . Let us add that the conflicts between interests of the children and those of the parent which often arise from the death of one of the parents do not usually exist whilst both the parents are alive. These are the family considerations upon which the article is founded, and tradition plainly confirms them. Thus in our ancient jurisprudence the distinction between the legal administration of a father and tutorship was well established. The first rested upon an agency created by law alone, based upon the confidence which the law reposed in paternal affection, from which it resulted that the powers of administration given to the father were broader and more comprehensive than those which the law conferred upon a tutor. (Comp. Merlin, Rep. VII, V° Légitime Administration; Coquille, sur l'art 2, de la Coutume de Nivernais, de Lauriére sur Loisel Inst. Cout. livre 1, titre IV, régle 1.)"

And when the genesis of the enactment which passed from the Napoleon Code into the codes of Louisiana is considered the accuracy of the observations of the commentator just cited

is made clear. . In the draft of the Napoleon Code which was
first submitted the provision subsequently contained in arti-
cle 389 of that code was not found. The enactment of the
article into the code was the result of a recommendation by
the Tribunat, its report on the subject expressly saying (Locré.
Legislat. Civ. t. VII, p. 215):

"We think that the first article of the chapter should ex-
press in precise terms what during the marriage should be the
authority of the father over the personal goods of his minor
children. . . . Never up to this time has it been exacted
that a father should be obliged to qualify as the tutor of his
children before the dissolution of the marriage. If while the
marriage exist the law did not make a distinction between the
father and mother and a tutor in the proper sense of the word,
it would follow that the father would be as to the personal
goods of his minor children subjected during marriage to all
the conditions and burdens which the law imposes upon a
tutor. The father would then be as to his minor children under
the supervision of an under tutor, would depend upon the
advice of a family meeting, etc., etc., all of which would be
repugnant to the accepted conceptions of paternal authority.
It seems fitting that up to the dissolution of marriage the only
title which the father should have is that of administrator, and
it is for this reason that we recommend the adoption of the
article."

And the views which were thus expounded have been sub-
stantially applied by the decided cases in France, and are
concurred in by the practically unanimous opinion of the
theoretical writers. The result of those decisions and the
opinions of the writers on the subject adequately portray the
plenary power conferred upon the father as the administrator
of all the property of his minor children during marriage and
the distinction between that authority and the narrower power
as to the natural tutorship arising only after the dissolution of
the marriage. The authorities will be found exhaustively
collected in the notes to article 389 of the Napoleon Code in

the Fuzier-Herman edition of that code, published at Paris in 1885.

Much reliance in argument is placed upon the terms of article 3350 of the Louisiana Code of 1870, which reads as follows:

"ART. 3350. Before fathers and mothers, who by law are entitled to the usufruct of property belonging to their minor children, shall be allowed to take possession of such property and enjoy the fruits and revenues thereof, they shall cause an inventory and appraisement to be made of such property, and cause the same to be recorded in the mortgage book of every parish in the State where they or either of them have immovable property."

This article was not contained in any of the previous codes. Its origin is this: Prior to the Louisiana Constitution of 1868 the moneyed obligations of natural tutors towards their minor children, of husbands to their wives, and some other pecuniary obligations expressly provided for by law, were secured by what was known to the Louisiana law as legal and tacit mortgages. Those mortgages existed by operation of law and without registry. No such provision, however, ever obtained, as we have seen, concerning a father administering upon the estate of his minor children during the marriage. The Louisiana constitution of 1868 (art. 123), provided that all legal, tacit mortgages should cease after a specified date, and expressly imposed upon the legislature the duty of providing by law for a mode of registry in order to preserve existing and future mortgages of that character. By an act passed in 1869, entitled an act to carry out this article of the constitution and "to provide for recording all mortgages and privileges," the legislature sought to comply with this constitutional direction. Acts La. 1869, p. 114. The act in question contained specific directions for recording mortgages of the character referred to, the mode of registry which was adopted as to these mortgages being the making of an abstract of an inventory showing the amount of the minor's property, and the putting of the same of record. Section 12, the last section

of the act, contained the exact provision subsequently embodied when the Code of 1870 was adopted, in article 3350, except that section 12 of the act of 1869, moreover, had these words, which are not found in the article of the code referred to: "Which recordation shall operate a mortgage on such property until a final settlement of the administration of said property." In other words, when the Code of 1870 came to be adopted the compilers omitted the words of section 12 of the act of 1869 just quoted, but placed in the code the remainder of the section providing for the registry of an abstract of the inventory in the case stated. It is difficult to determine exactly the reason which impelled the compilers of the Code of 1870 to omit the provision as to mortgages found in section 12 of the act of 1869, conceding that that provision was constitutional despite the title of the act, and to reënact the remainder of the section providing for the registering of an abstract of an inventory in the case named, since by the omission of the provision as to mortgage no possible security could arise from the recording of an abstract of an inventory in the case provided for. For, certain it is that neither under the codes as they existed prior to 1870, nor in that code, was or is there any provision for a legal mortgage securing the minors against loss resulting from the enjoyment by either parent during marriage of a usufruct. The intention of the compilers of the Code of 1870 not to change the powers of administration of the property of his minor children, conferred upon the father by the prior codes, is expressly shown by the reënactment without change of those provisions, and is cogently exemplified by the further fact that in reënacting the provisions in question they were removed from the chapters of the code referring to tutorship and were transferred to the chapters of the code relating to paternal authority. As the full significance to be given to article 3350 is a question of local Louisiana law, which we are not called to decide, except so far as is essential to the determination of the case before us, we content ourselves with saying that we think it is clear that that

article in no way modifies or controls the full power of the father to administer during marriage the estates of his minor children, so well settled under the Louisiana law. In any event, we think that article 3350 simply implies that unless an inventory is made and an abstract recorded the usufruct which otherwise would exist shall not obtain. But giving this effect to the article in no way modifies the powers of administration conferred upon the father during marriage to which we have referred, because, as clearly pointed out by the authorities which we have previously cited, the administration is wholly independent of the usufruct and applies to the minor's property during marriage, whether or not there be a right of usufruct.

As then by the law of their domicil the minors were represented by their father as administrator, with full power under that law to receipt for and administer the property for their account, was the transfer of property made by Tracy in the District of Columbia to Thomas M. Turner, as the administrator or representative of his minor children, valid and binding? It is said that it was not because Turner, the testator, was domiciled in Virginia, and if the property had been administered upon in that jurisdiction, never mind what was the power of the father, under the law of Louisiana he would not have been entitled to receive or remove the property from the jurisdiction without an order made by a Virigina court and upon the giving of satisfactory security. But the property in question was in the District of Columbia, and in the absence of all showing that there were creditors in Virginia, the Probate Court of the District of Columbia would have had power under the circumstances disclosed, if administration had been had in the District, to direct the delivery of the property to the person lawfully entitled to represent the minors, without compelling the transmission of the funds to Virginia. Under these circumstances, we are of opinion that the payment in the District of Columbia to the father of the complainants as administrator of their estate, fully empowered to collect and

receive the same by the law of their domicil, is controlled by the cases of *Wilkins* v. *Ellett*, 108 U. S. 256; *S. C.*, 9 Wall. 740. It is, however, urged that although as a general principle the cases referred to are decisive of this, the terms of the will and the knowledge which Tracy had of the intentions of the testator, made the delivery by Tracy to the father of the children a violation of the terms of the will and operated a fraud upon the rights of the children, which, it is claimed, takes this case out of the general rule. The unsoundness of the first of these contentions, which rests upon the terms of the will, we think is demonstrated by its mere statement. The proposition is that the words of the will "and appoint Philip A. Tracy to distribute the proceeds of said property equally between them" (the minor children of Thomas M. Turner) implied a direction to Tracy to hold and administer the property for the benefit of the children, and not to pay it over to a lawfully appointed administrator or to one legally authorized to receive it. The second contention rests upon the assumption that as a matter of fact the proof establishes that Tracy had knowledge that the purpose of Silas H. Turner in making his will was to exclude the administration by Thomas M. Turner of the property bequeathed to his children, because Thomas M. Turner was a spendthrift and the testator lacked confidence in him. And this assumption of fact, as we have seen, was adopted by the trial court. Conceding for the sake of argument only that the existence of such knowledge on the part of Tracy would have caused it to be a fraud for him to turn over the property to the lawful administrator of the minors, we can find no reliable proof whatever in the record justifying the premise of fact upon which the contention is based. The sole and only possible basis for such an assumption is a statement made by Erle H. Turner in the course of his examination-in-chief, where, in purporting to give his recollection of a conversation had with Tracy, he said:

"Tracy himself wrote the will; and he said that he had suggested to uncle to leave it to my father, and if I remember,

his answer was no, he would spend it, or something like that; and then he suggested that he leave it to his children, and that idea suited uncle, and he wrote the will."

We shall not stop to point out the conflict between this statement made by Erle Turner and the intimate and friendly relations as exhibited by his correspondence, continuing almost up to the time of the death of Tracy, or the conflict between the statements and the various parts of his testimony and his letters. We do not pause to do these things, because in our opinion the proof introduced by both parties beyond question establishes that Silas H. Turner entertained no such feeling towards his brother as the quoted testimony of Erle Turner implies. Thus the complainants' own proof showed that Thomas M. Turner was summoned to the bedside of his dying brother and there remained for a month and a half; that during that time he was in constant and close relation with the brother, without the slightest intimation of any want of confidence between them. On the contrary, Thomas M. Turner made repeated statements and declaration in the course of his testimony, to the effect that his brother referred to the will, and informed him that he expected him to administer the property, etc. That Tracy regarded Thomas M. Turner as honest is demonstrated by his whole course of conduct, and is illustrated by his allusions to Thomas M. Turner in the memorandum which he left for the information of his executors.

The receipt being binding, the only question remaining for consideration is whether any liability rests upon the estate of Tracy growing out of the investment in real estate referred to therein. From an inspection of the receipt it will be seen that that subject was thus described: Lots on Maryland avenue N. E. $1,800; and as we have also previously stated at the time of the giving of the receipt Tracy delivered to Thomas M. Turner a certificate, which we have heretofore reproduced, and which, as we have said, Turner subsequently turned over to his son Erle.

The evidence shows that the investment in question was represented by shares of stock of the Mutual Investment Company, which had acquired square 937 in the city of Washington. On September 3, 1888, Tracy subscribed to twenty-five shares of the stock of the par value of $150 per share, making a total liability of $3,750. He had paid assessments aggregating only $85 per share, when, on February 6, 1890, the land was sold at a profit of sixty dollars on each share of stock. It may, of course, be presumed that during the interval between the subscription to the stock and the winding up of the venture Tracy retained possession of the balance, upon which he was liable on the subscription over and above the sums actually paid on assessment calls, so as to be ready to respond to calls up to the par value of the stock. Twelve of the subscribed shares would represent an investment of $1,800, the exact amount stated in the receipt. The profit on the twelve shares amounted to $720. This profit with the principal of the investment aggregated, therefore, on February 6, 1890, $2,520. Tracy, however, received but a trifling amount in cash, the greater part of the sum due him on the settlement being paid in notes of the purchaser of square 937, secured by trust deed. When the notes were paid, as shown in a letter written by Tracy to T. M. Turner on May 7, 1892, heretofore reproduced in the margin, the investment had realized $2,600. On account of the refusal of Tracy in the spring of 1891 to pay over this sum to Thomas M. Turner, then living in Texas, unless he qualified as administrator of the estate, Tracy invested the amount in real estate notes, which were in Tracy's possession on May 7, 1892. Thomas M. Turner testified that prior to the spring of 1891 Tracy told him that the estate had realized from the investment in the Maryland avenue lots the sum of $2,750, although he does not claim to have taken issue with the statement in Tracy's letter that the amount was $2,600. The auditor, however, fixed the amount at $3,069.65, and held the estate of Tracy liable to account for that sum from February 6, 1890.

It appears from statements in the record that following the panic of 1893 payments of interest on this loan ceased and the security became impaired, and, from passages in letters of Tracy, it may be conjectured the loan was secured by a second mortgage and a sale was had under the first mortgage, which failed to realize more than sufficient to pay the primary incumbrance. It being, however, impossible from the record to determine with precision the ultimate fate of the investment in question, and as the sum originally realized therefrom is fixed with sufficient accuracy and has not been accounted for, we think the estate of Tracy should be held liable as of February 6, 1890, for the sum of two thousand five hundred and twenty dollars with legal interest. From this amount, however, there is to be deducted the one-fourth proportion of Erle H. Turner, as the sums admitted to have been paid to him by Tracy on account of this asset exceeded his proportion of the principal and interest. In other words, therefore, the estate of Tracy will be held accountable to complainants other than Erle H. Turner in equal proportions for the sum of eighteen hundred and ninety dollars with legal interest thereon from February 6, 1890.

The decree of the Court of Appeals is reversed and the cause is remanded with directions to reverse the decree of the Supreme Court of the District of Columbia and to remand the cause to that court with directions to enter a decree in conformity with this opinion. The costs in this court as well as in both the courts below are to be paid by the complainants and before distribution of the sum for which the estate of Tracy is held accountable.

MR. JUSTICE BROWN took no part in the consideration and decision of this case.